**2024-1551**

# United States Court of Appeals for the Federal Circuit

ADNEXUS INC.,

*Plaintiff-Appellant,*

– v. –

META PLATFORMS, INC.,

*Defendant-Appellee.*

*On Appeal from the United States District Court for the Western District of Texas in Case No. 23-cv-00152-JKP Jason Kenneth Pulliam, Judge*

## BRIEF FOR PLAINTIFF-APPELLANT

CHARLES S. COTROPIA
1756 Bison Meadow Lane
Heath, TEXAS 75032
(214) 725-1385
ccotropia@icloud.com

*Counsel for Plaintiff-Appellant*

JUNE 17, 2024

CP COUNSEL PRESS (800) 4-APPEAL • (330185)

## PATENT CLAIM AT ISSUE

U.S. Patent 8,719,101, Claim 1:

1. A method of online advertising, comprising:

providing an advertisement associated with a first party for display in a network communication delivered to a computing device of a recipient during a browsing session, wherein the advertisement contains an interactive element displayed within the advertisement, and wherein the network communication is associated with a second party different than the first party;

receiving an indication that the recipient activated the inter active element displayed within the advertisement;

determining, in response to the receiving the indication, whether an identifier containing unique identifying information about the recipient is present on the computing device;

if the identifier containing unique identifying information about the recipient is not present on the computing device:

causing a text field to be displayed in at least a portion of the advertisement;

receiving contact information inputted into the text field by the recipient;

generating a user profile associated with the recipient based on the contact information; and

causing an identifier associated with the user profile to be stored on the computing device of the recipient; and

if the identifier containing unique identifying information about the recipient is present on the computing device:

retrieving a user profile associated with the recipient from a visitor information database using at least a portion of the identifier, wherein the user profile comprises at least delivery method preferences and demo graphic information;

retrieving additional information associated with the advertisement based on at least a portion of the user profile associated with the recipient;

delivering the additional information to the recipient based on the delivery method preferences, the delivering being performed without interrupting the browsing session of the recipient; and

recording the activation by the recipient of the interactive element as recipient tracking data in an analytics server, the recipient tracking data being associated with the unique identifying information about the recipient.

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 24-1551

**Short Case Caption** Adnexus Incorporated v Meta Platforms Inc.

**Filing Party/Entity** Adnexus Incorporated

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.
2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.
3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.
4. Please do not duplicate entries within Section 5.
5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 05/24/2024

Signature: /s/ Charles S. Cotropia

Name: Charles S. Cotropia

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| Adnexus Incorporated | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| Joe J. Zito, Whitestone Law | | |
| Sanford Warren, Jr., Warren Rhoades lLP | | |
| R. Scott Rhoades, Warren Rhoades LLP | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐ Yes (file separate notice; see below) ☑ No ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

**Page**


TABLE OF AUTHORITIES .......... v

STATEMENT OF RELATED CASES .......... viii

JURISDICTIONAL STATEMENT .......... 1

STATEMENT OF THE ISSUES .......... 2

STATEMENT OF THE CASE .......... 3

I. FACTS .......... 3

A. Parties .......... 3

B. The Asserted Claim of the ’101 Patent .......... 3

II. PROCEDURAL HISTORY .......... 5

SUMMARY OF THE ARGUMENT .......... 9

ARGUMENT .......... 14

I. STANDARDS OF REVIEW .......... 14

A. Motions to Dismiss Under FRCP 12 .......... 14

B. Leave to Amend Under FRCP 15 .......... 14

C. Dismissal With Prejudice .......... 15

II. DIRECT INFRINGEMENT IS SUFFICIENTLY PLED .......... 16

A. The Pleading Standard for a Claim of Direct Infringement .......... 17

B. Sufficient Facts Are Alleged to Show Practice of Element [1f] .......... 18

III. PROSECUTION HISTORY ESTOPPEL DOES NOT BAR DOCTRINE OF EQUIVALENTS FOR ELEMENT [1f] .......... 29

IV. DISMISSAL WITH PREJUDICE NOT WARRANTED .......... 32

CONCLUSION .......... 34

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......... 2, 17, 29

*Barrera v. BP, P.L.C. (In re Deepwater Horizon)*,
907 F.3d 232 (5th Cir. 2018) .......... 15

*Batson v. Neal Spelce Assocs.*,
765 F.2d 511 (5th Cir. 1985) .......... 15, 33

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) .......... 2, 17

*Bot M8 LLC v. Sony Corp. of Am.*,
4 F.4th 1342 (Fed. Cir. 2021) .......... 29

*Bustos v. Martini Club*,
599 F.3d 458 (5th Cir. 2010) .......... 17

*De La Garza Gutierrez v. Pompeo*,
741 F. App'x 994 (5th Cir. 2018) .......... 15

*Disc Disease Solutions Inc. v. VGH Solutions, Inc.*,
888 F.3d 1256 (Fed. Cir. 2018) .......... 2, 10, 17, 22, 25

*Edionwe v. Bailey*,
860 F.3d 287 (5th Cir. 2017) .......... 14, 15

*F.D.I.C. v. Conner*,
20 F.3d 1376 (5th Cir. 1994) .......... 15, 33

*Garcia v. Woman's Hosp. of Tex.*,
143 F.3d 227 (5th Cir. 1998) .......... 15

*Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co.*,
313 F.3d 305 (5th Cir. 2002) .......... 16, 34

*Griggs v. Hinds Junior College*,
563 F.2d 179 (5th Cir. 1977) .......... 16

*Herrmann Holdings Ltd. v. Lucent Techs., Inc.*,
302 F.3d 552 (5th Cir. 2002) .......... 34

*Jones v. Greninger*,
188 F.3d 322 (5th Cir. 1999) ....................................................................18

*Kuykendall v. Accord Healthcare, Inc.*
(*In re Taxotere (Docetaxel) Prods. Liab. Litig*.),
966 F.3d 351 (5th Cir. 2020) .............................................................. 16, 33

*La. Indep. Pharmacies Ass'n v. Express Scripts, Inc.*,
41 F.4th 473 (5th Cir. 2022) ....................................................................14

*Link v. Wabash R.R. Co*.,
370 U.S. 626, 82 S. Ct. 1386, 8 L. Ed. 2d 734 (1962)..........................................15

*Lormand v. US Unwired, Inc.*,
565 F.3d 228 (5th Cir. 2009) ....................................................................18

*McZeal v. Sprint Nextel Corp.*,
501 F.3d 1354 (Fed. Cir. 2007) ................................................................28

*Muhammad v. Dallas County Cmty. Supervision & Corr. Dep't*,
479 F.3d 377 (5th Cir. 2007) ....................................................................18

*Panasonic Corp. v. MagnaInt'l., Inc.*,
6:21-cv-00319-ADA, 2022 WL 174513 (W.D. Tex. Feb 20, 2022)....................29

*Patrician Mgmt., L.L.C. v. BXS Ins., Inc.*,
No. 23-30434, 2024 U.S. App. LEXIS 6175 (5th Cir. Mar. 14, 2024)................14

*Rosenzweig v. Azurix Corp.*,
332 F.3d 854 (5th Cir. 2003) ....................................................................15

*Skinner v. Switzer*,
562 U.S. 521, 131 S. Ct. 1289, 179 L. Ed. 2d 233 (2011) ............................ 16, 17

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007) ...................................14

*Test Masters Educ. Servs., Inc. v. Singh*,
428 F.3d 559 (5th Cir. 2005) ....................................................................18

*Unification Techs, LLC v. Dell Techs, Inc.*,
No. 6:20-CV-00499-ADA, 2021 WL 1343188 (W.D. Tex. Jan 28, 2021)..........25

*Visual Memory LLC v. NVIDIA Corp.*,
867 F.3d 1253 (Fed. Cir. 2017) ................................................................14

*White v. U.S. Corr.*,
996 F.3d 302 (5th Cir. 2021) ....................14

*Whitley v. BP, P.L.C.*,
838 F.3d 523 (5th Cir. 2016) ....................14

*Woodson v. Surgitek, Inc.*,
57 F.3d 1406 (5th Cir. 1995) ....................15

**Statutes & Other Authorities:**

28 U.S.C. § 1295(a)(1) ....................1

28 U.S.C. § 1331 ....................1

28 U.S.C. § 1338 ....................1

35 U.S.C. § 271 ....................9

Fed. R. Civ. P. 12 .................... 6, 14

Fed. R. Civ. P. 12(b)(6) .................... 14, 18

Fed. R. Civ. P. 15 ....................14

Fed. R. Civ. P. 15(a)(2) ....................14

https://en-gb.facebook.com/business/help/
829597887147190?id=735435806665862 ....................24

https://www.facebook.com/business/news/lead-ads-launch ....................24

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, Appellant Adnexus Inc. affirms that no other appeal in or from the underlying District Court proceeding was previously before this Court or any other appellate court. Adnexus affirms that it is unaware of any cases pending before this Court or any other tribunal that will directly affect or be directly affected by the decision here.

## JURISDICTIONAL STATEMENT

This appeal was timely noticed on March 1, 2024, from the February 2, 2024, Final Judgment. Appx12, Appx429. The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1338, and this Court has jurisdiction under 28 U.S.C. § 1295(a)(1).

## STATEMENT OF THE ISSUES

1. Did the District Court commit legal error by summarily concluding that Appellant failed to meet the plausibility standard, which is met when a "plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged"? *Disc Disease Solutions Inc. v. VGH Solutions, Inc.*, 888 F.3d 1256, 1260 (Fed. Cir. 2018) (quoting *Iqbal*, 556 U.S. at 678). See *Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) and Ashcroft v. Iqbal*, 556 U.S. 662 at 678 (2009).

2. Did the District Court commit legal error by finding that prosecution history estoppel was applicable in its finding that claim construction could not demonstrate that Appellant had provided sufficient evidence to meet the pleading standard for showing that element 1[f] of Claim 1 of the patent-in-suit could be concluded to have been practiced by Appellee?

3. Did the District Court commit legal error by dismissing the case with prejudice and not allowing the Appellant to refile with additional submissions of evidence?

## STATEMENT OF THE CASE

### I. FACTS

#### A. Parties

Plaintiff/Appellant Adnexus Incorporated ("Adnexus") sued Defendant/Appellee Meta Platforms, Inc. ("Meta") for patent infringement, alleging that Meta's "Lead Ads" products and services infringe at least claim 1 of Adnexus's U.S. Pat. No. 8,719,101 ("the '101 Patent").

#### B. The Asserted Claim of the '101 Patent

The FAC asserts infringement of at least claim 1 of the '101 Patent and includes infringement allegations on an element-by-element basis for the Accused Products – Meta's Lead Ads products. Appx78 at ⁋29; Appx95-Appx106; Appx110-Appx126. The elements of claim 1 are identified as follows:

| | |
|---|---|
| [1a] | A method of online advertising, comprising: |
| [1b] | providing an advertisement associated with a first party for display in a network communication delivered to a computing device of a recipient during a browsing session, wherein the advertisement contains an interactive element displayed within the advertisement, and wherein the network communication is associated with a second party different than the first party; |
| [1c] | receiving an indication that the recipient activated the interactive element displayed within the advertisement; |
| [1d] | determining, in response to the receiving the indication, whether an identifier containing unique identifying information about the recipient is present on the computing device; |

| | |
|---|---|
| [1e] | if the identifier containing unique identifying information about the recipient is not present on the computing device:<br>causing a text field to be displayed in at least a portion of the advertisement;<br>receiving contact information inputted into the text field by the recipient;<br>generating a user profile associated with the recipient based on the contact information; and causing an identifier associated with the user profile to be stored on the computing device of the recipient; |
| [1f] | if the identifier containing unique identifying information about the recipient is present on the computing device: retrieving a user profile associated with the recipient from a visitor information database using at least a portion of the identifier, wherein the user profile comprises at least delivery method preferences and demographic information; |
| [1g] | retrieving additional information associated with the advertisement based on at least a portion of the user profile associated with the recipient; |
| [1h] | delivering the additional information to the recipient based on the delivery method preferences, the delivering being performed without interrupting the browsing session of the recipient; and |
| [1i] | recording the activation by the recipient of the interactive element as recipient tracking data in an analytics server, the recipient tracking data being associated with the unique identifying information about the recipient. |

Claim 1 is addressed to a method of online advertising that includes a number of steps occurring during a browsing session by the user of a computing device. Appx94. According to the embodiment claimed, an advertisement containing an interactive element within it is displayed to a recipient during an

internet browsing communication. Appx94. The advertisement is associated with a first party, while the browsing communication is associated with a second, different party. Appx94. The recipient activates the interactive element within the advertisement. When the recipient's device does not have an identifier stored on it that is recognized by the system, steps are taken to receive input from the recipient to generate a user profile and store an identifier on the recipient's device. Appx94.

Alternatively, when the recipient's device does have an identifier stored on it, it is used to retrieve user profile information from a database that is then used to deliver additional information to the recipient. Appx94. This is done without interrupting the browsing communication associated with the second party. Appx94. Activation of the interactive element within the advertisement by the recipient is recorded and associated with the information about the recipient. Appx94.

## II. PROCEDURAL HISTORY

Adnexus Incorporated ("Adnexus") sued Meta Platforms, Inc. ("Meta") for patent infringement, alleging that Meta's "Lead Ads" products and services infringe at least claim 1 of Adnexus's U.S. Pat. No. 8,719,101 ("the '101 Patent"). Appx29-Appx34. In response to Adnexus's original Complaint, filed on February 23, 2023, counsel for Meta sent a letter to Adnexus on May 12, 2023. The letter stated Meta's intention to file a motion to dismiss the original Complaint for failure to state a claim. Appx161-Appx166. The letter alleged certain purported

deficiencies within the allegations of the original Complaint. The parties conferred. Despite disagreeing that any purported deficiency had merit, Adnexus agreed to file an amended complaint. This action was taken in view of the procedures relating to Rule 12 motions set forth in the District Court's Standing Order in Civil Cases ("Standing Order"). Appx62-Appx63. A notice of intent to amend its pleading was filed by Adnexus on May 19, 2023. Appx69-Appx71.

Adnexus timely filed its First Amended Complaint ("FAC") on May 26, 2023. Appx72-Appx133. The FAC included additional allegations in support of its claims for indirect infringement and willfulness against Meta. Appx76-Appx79. A claim chart mapping claim 1 of the '101 Patent to the accused Lead Ads products was attached. Appx95-Appx106. Also attached is a separate infringement analysis, also mapping claim 1 of the '101 Patent to the accused Lead Ads products, that was not filed with the original Complaint. Appx110-Appx126. Each presents evidence of infringement in the form of excerpts from and hyperlinks to publicly available sources published by Meta that describe the Lead Ads products, and does so on a limitation-by-limitation basis.

Five weeks later, on June 30, 2023, Meta filed a motion to dismiss Adnexus's First Amended Complaint ("FAC") for failure to state a claim ("Motion"). Appx134-Appx157. The Motion alleged:

> The Amended Complaint and the amended claim chart do not remedy the deficiencies identified in Meta's Deficiency Letter, including: (1)

> that the determination of whether the identifier is present occurs after the advertisement is engaged; (2) if the identifier is not present, generating a user profile; (3) if the identifier is present, that the retrieved user profile contains delivery method preferences, and (4) if the identifier is present, retrieving and delivering additional information based on the delivery method preferences. Appx144 at ⁋12.

The Motion maintained that the purported deficiencies of the original Complaint persist in the FAC with respect to claim elements identified as [1d], [1e], [1f], and [1h]. Appx146-Appx152. The arguments made in support of each of the foregoing deficiencies wholly ignore the infringement analysis newly added as Exhibit D to the FAC and the online sources hyperlinked throughout it (Appx110-Appx126), and instead focus exclusively on the claim chart re-submitted as Exhibit B (Appx95-Appx106). Appx146-Appx152.

The FAC presents sufficient factual allegations to plausibly state claims of direct and indirect infringement of claim 1 by the Lead Ads products and services. The exhibits attached to the FAC, highlighted above, each present publicly available information about Lead Ads obtained from online guides and help pages published by Meta and directed to Lead Ads customers. Adnexus' Response to the Motion cites to these exhibits and the factual matter presented therein to refute the purported deficiencies in the FAC alleged by Meta. Appx401-Appx407. Meta filed its Reply on July 21, 2023. Appx410-Appx425.

On February 2, 2024, the District Court granted Meta's Motion and entered a

Final Judgment in the case dismissing the Adnexus's infringement claims with prejudice. Appx1-Appx11 ("Order"); Appx12. The Order considered only a single element of claim 1, Element [1f], without consideration of any other challenge raised by Meta. Appx8. The Court found Element [1f] was insufficiently plead:

> "Here, the FAC lacks sufficient factual allegations to support the delivery method preferences limitation set out in element [1f]. That element requires that Meta Lead Ads 'retriev[es] a user profile associated with the recipient from a visitor information database using at least a portion of the identifier, wherein the user profile comprises at least delivery method preferences and demographic information.' As Defendant points out, Plaintiff makes no allegation that Meta Lead Ads retrieves any user profile that includes any delivery method preferences." Appx8 (internal citations omitted).

The Court reached this finding by, first, disregarded the evidence and factual allegations presented in Exhibit B to the FAC and, second, by ignoring altogether the evidence and factual allegations presented in Exhibit D to the FAC, concluding without explanation that:

> "In doing so, [Plaintiff] equates pre-filled forms based on specific contact information as equivalent to the user's delivery method preference. However, the prosecution history precludes Plaintiff from relying on the doctrine of equivalents. And the Court finds contact information sufficiently distinct from delivery method preferences to find Plaintiff's allegations insufficient to state a plausible claim for direct infringement." Appx9.

The Order goes on to find that the FAC fails to state a plausible claim for indirect infringement, with that ruling being premised entirely upon its having concluded that direct infringement is not sufficiently pled. Appx10. Leave to

amend was denied in view of the District Court's Standing Order and on the assertion that Adnexus had already "pled [its] 'best case.'" Appx10-Appx11.

In view of the foregoing, it is evident that the District Court's rulings are tied exclusively to its finding that insufficient allegations are presented to show practice of the "delivery methods preference" limitation within Element [1f]. Further, it is apparent that this conclusion was reached without consideration of all the evidence and allegations made in the FAC and exhibits to it. It was premised on the District Court having implicitly adopted and applied a narrow scope for what could constitute a "delivery method preference." By doing so, the District Court failed to consider all facts and inferences in the light most favorable to Adnexus, as it must when deciding a motion to dismiss. Likewise, the findings that Adnexus's infringement contentions relied on the doctrine of equivalents and that Adnexus is estopped from asserted equivalents are further instances of the Court refusing to view the facts and inferences in the light most favorable to Adnexus.

On March 1, 2024, Adnexus appealed the Final Judgment (Appeal Doc. No. 1). On March 31, 2024, Adnexus requested an extension of time until June 17, to file this Opening Brief (Appeal Doc. 20) and the request for extension was granted (Appeal Doc. 21) until June 17, 2024, to file this Opening Brief.

## SUMMARY OF THE ARGUMENT

To state a claim for patent infringement under 35 U.S.C. § 271, a plaintiff

need only give the defendant "fair notice" of the infringement claim and "the grounds upon which it rests." *Disc Disease Sols. Inc. v. VGH Sols., Inc.*, 888 F.3d 1256, 1260 (Fed. Cir. 2018). "Fair notice," in turn, requires the plaintiff to plausibly allege that the accused products meet "each and every element of at least one claim" of the asserted patent. *Disc Disease*, 888 F.3d at 1260.

In this case, Appellant clearly met this burden. More than sufficient evidence was submitted to meet the pleading standard required in a patent case set as set by decisions rendered by the Supreme Court, by this Court, and District Courts. Nonetheless, the District Court issued a Dismissal of the case with prejudice concluding that a single element of the asserted claim was insufficiently pled. Appx8. This ruling ignores or disregards the evidence cited in the FAC and its attached exhibits relating to this claim element. More specifically, the District Court failed to consider the factual allegations of the FAC as a whole, including those presented in each of Exhibits B and D to it. Appx8-Appx9.

To the extent it did consider facts alleged in the FAC, the District Court failed to view them in the light most favorable to Appellant. Appx8-Appx9. Instead, the District Court inherently adopted an unduly narrow construction for "delivery method preferences" which had the effect of confining its scope to cover only a single, exemplary embodiment disclosed in the specification of the '101 Patent. Appx9. In effect, the District Court held that a delivery method preference

could not be gleaned from input from that recipient providing certain contact information for reaching the recipient. Appx9. The District Court rejects any notion that a delivery method preference can be indicated in any manner other than by eliciting an express response to select one contact method a list of available options, effectively limiting the scope to encompassing only the embodiment shown in Fig. 2 of the ‘101 Patent. Appx9 (rejecting assertion that delivery method preference can be derived from consideration of whether and what specific contact information the recipient provided).




Appx16 (Fig. 2 of ‘101 Patent) (annotations added)

No means of discerning a delivery preference is contemplated by the District Court other than this most literal, brute force manner of obtaining this information. Only by applying this narrow interpretation does the District Court conclude that

the FAC failed to allege practice of Element [1f] by the Accused Products. It is relied upon to disregard the following allegations within the FAC that ***non-required contact information*** that a recipient ***elects to share*** with Facebook is usable to determine a delivery preference, and is used for that purpose:




Appx118-Appx119; *see*, *also*, Appx101-Appx102.

At the pleadings stage, and in the absence of any briefing or expert guidance on the proper scope of the limitations of the claim, Adnexus is entitled to an interpretation of its claims in a manner that is most favorable to it. Element [1f] should not be interpreted such that it would only include within its scope just one

embodiment disclosed in the specification.

The District Court's analysis is also incorrectly premised upon a finding that Appellant is not permitted to assert infringement of Element [1f] under the doctrine of equivalents. Appx9. Not only was this position not argued in Meta's Motion, it is wholly unsupported by the prosecution history for the '101 Patent. Claim 1 was never amended during prosecution. *Compare* Appx244-Appx245 ("New" claim 18 first presented), Appx383 (claim 18 issues as claim 1 of '101 Patent); *with*, Appx94 (issued claim 1). It proceeded to issuance in precisely the same form as it was originally presented. Beyond that, the statements from the file history to distinguish Claim 1 from the prior art that are cited by Meta and relied upon by the District Court in its Order are not addressed to Element [1f]. Appx359 (discussing "determining…" Element [1d] and requirement for "a text field to be displayed in at least a portion of the advertisement" in Element [1e]); Appx147 (citing file history in argument relating to Element [1d]). They relate to a preceding limitation of the claim and, therefore, cannot provide a basis for foreclosing the doctrine of equivalents with regard to Element [1f]. This misunderstanding by the District Court lead to it wholly disregarding Adnexus's allegations for Element [1f] and reaching the wrong ruling on the Motion to Dismiss.

# ARGUMENT

## I. STANDARDS OF REVIEW

### A. Motions to Dismiss Under FRCP 12

This Court "appl[ies] regional circuit law when reviewing motions to dismiss for failure to state a claim." *Visual Memory LLC v. NVIDIA Corp.*, 867 F.3d 1253, 1257 (Fed. Cir. 2017). A district court order ruling on a motion to dismiss is reviewed *de novo*. *La. Indep. Pharmacies Ass'n v. Express Scripts, Inc.*, 41 F.4th 473, 478 (5th Cir. 2022); *Whitley v. BP, P.L.C.*, 838 F.3d 523, 526 (5th Cir. 2016). When ruling on a 12(b)(6) motion, the court must accept all the factual allegations pled in the complaint as true and view the complaint in the light most favorable to the plaintiff. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007); *White v. U.S. Corr.*, 996 F.3d 302, 306-07 (5th Cir. 2021).

### B. Leave to Amend Under FRCP 15

"[A] party may amend its pleading only with the… court's leave [which] should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2); *Patrician Mgmt., L.L.C. v. BXS Ins., Inc.*, No. 23-30434, 2024 U.S. App. LEXIS 6175, at *5 (5th Cir. Mar. 14, 2024). Denial of leave to amend is reviewed for abuse of discretion. *Edionwe v. Bailey*, 860 F.3d 287, 291 (5th Cir. 2017).

"[T]he district court's discretion is considerably less" when applying this

Rule. *Edionwe*, 860 F.3d at 295 (quoting *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 863-64 (5th Cir. 2003)). The Supreme Court has enumerated just "five considerations in determining whether to deny leave to amend a complaint: 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of the allowance of the amendment, [and] futility of the amendment.'" *Id.* "Absent such factors, the leave sought should, as the rules require, be freely given." *Id.*; *De La Garza Gutierrez v. Pompeo*, 741 F. App'x 994, 1000 (5th Cir. 2018).

**C. Dismissal With Prejudice**

District courts are vested with the power to "manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Woodson v. Surgitek, Inc.*, 57 F.3d 1406, 1417 (5th Cir. 1995) (quoting *Link v. Wabash R.R. Co.*, 370 U.S. 626, 630-31, 82 S. Ct. 1386, 8 L. Ed. 2d 734 (1962)). "We review matters concerning docket management for an abuse of discretion." *Barrera v. BP, P.L.C. (In re Deepwater Horizon)*, 907 F.3d 232, 234 (5th Cir. 2018); *Garcia v. Woman's Hosp. of Tex.*, 143 F.3d 227, 229 (5th Cir. 1998) (per curiam).

In the 5th Circuit, dismissal with prejudice is considered a "draconian remedy" and a "remedy of last resort." *F.D.I.C. v. Conner*, 20 F.3d 1376, 1380 (5th Cir. 1994); *Batson v. Neal Spelce Assocs.*, 765 F.2d 511, 515 (5th Cir. 1985));

*Kuykendall v. Accord Healthcare, Inc*. (*In re Taxotere (Docetaxel) Prods. Liab. Litig*.), 966 F.3d 351, 357 (5th Cir. 2020). Moreover, in the 5th Circuit, "our cases support the premise that 'granting leave to amend is ***especially appropriate*** . . . when the trial court has dismissed the complaint for failure to state a claim.'" *Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002) (quoting *Griggs v. Hinds Junior College*, 563 F.2d 179, 180 (5th Cir. 1977) (per curiam).

## II. DIRECT INFRINGEMENT IS SUFFICIENTLY PLED

The question in this case is whether the Adnexus has pled sufficient facts to satisfy the pleading standard applicable in a patent case. Only if Adnexus has failed to do so can Meta's Motion be granted. *Skinner v Switzer,* 562 U.S. 521, 530, 131 S.Ct. 1289, 179 L.Ed.2d 233 (2011). Adnexus's FAC and attachments to it do so. Appx72-Appx82; Appx95-Appx106; Appx110-Appx126. They include factual allegations presented on an element-by-element basis to show how the Lead Ads products infringe claim 1 of the '101 Patent. Appx95-Appx106; Appx110-Appx126. Meta has acknowledged that the FAC satisfies the pleadings standard with respect to each of limitations [1a], [1b], [1c], [1g], and [1i] of claim 1 by virtue of having omitted any mention of these limitations in its notice letter and Motion. Appx160-Appx166; Appx134-Appx157. Only certain aspects of limitations [1d], [1e], [1f], and [1h] have ever been raised. Appx160-Appx166;

Appx134-Appx157. Among these, only the allegations corresponding to limitation [1f] were considered by the District Court and held insufficient. Appx8-Appx10.

### A. The Pleading Standard for a Claim of Direct Infringement

The FAC must include sufficient factual allegations to establish "fair notice" of Adnexus's claims of infringement against Meta and "the grounds upon which it rests." *Disc Disease Sols. Inc. v. VGH Sols., Inc.*, 888 F.3d 1256, 1260 (Fed. Cir. 2018). A patent infringement Plaintiff must plausibly allege that the accused products meet "each and every element of at least one claim" of an asserted claim. *Id*. The question is not whether the plaintiff will ultimately prevail, "but whether [the] complaint was sufficient to cross the [] threshold." *Skinner v Switzer,* 562 U.S. 521, 530, 131 S.Ct. 1289, 179 L.Ed.2d 233 (2011).

Stated another way, Adnexus must plead enough facts "to state a claim to relief that is plausible on its face." *Bustos v. Martini Club*, 599 F.3d 458, 461 n.2 (5th Cir. 2010) (citing *Ashcroft v. Iqbal,* 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007))). The "plausibility standard is met when 'the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Disc Disease Solutions Inc. v. VGH Solutions, Inc.*, 888 F.3d 1256, 1260 (Fed. Cir. 2018) (quoting *Iqbal,* 556 U.S. at 678).

Importantly, at the pleadings stage, the District Court must "accept all well-pleaded facts as true, and view those facts in the light most favorable to the plaintiff." *Id.* A claim cannot be dismissed under Rule 12(b)(6) unless the plaintiff "would not be entitled to relief under any set of facts or any possible theory that [it] could prove consistent with the allegations in the complaint." *Muhammad v. Dallas County Cmty. Supervision & Corr. Dep't*, 479 F.3d 377, 380 (5th Cir. 2007) (citing *Jones v. Greninger*, 188 F.3d 322, 324 (5th Cir. 1999)). Accordingly, "motions to dismiss under Rule 12(b)(6) are 'viewed with disfavor and are rarely granted.'" *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009) (quoting *Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 570 (5th Cir. 2005).

Of course, a complaint for patent infringement cannot simply recite the claim elements and baldly conclude that the accused products meet every limitation, but that is not the case here. Indeed, Exhibits B and D to the FAC each presented detailed infringement analysis of the Lead Ads product for every limitation of claim 1. Appx95-Appx106, Appx110-Appx126. Each specifically addressed the requirements of Element [1f] – the only limitation of claim 1 found insufficiently pled by the District Court. Appx9; Appx101-Appx102; Appx119-Appx120.

### B. Sufficient Facts Are Alleged to Show Practice of Element [1f]

Element [1f] requires: "if the identifier containing unique identifying

information about the recipient is present on the computing device: retrieving a user profile associated with the recipient from a visitor information database using at least a portion of the identifier, wherein the user profile comprises at least delivery method preferences and demographic information." Appx94.

The only aspect of this Element alleged to be insufficiently pled in Meta's Motion related to whether the user profile comprises "delivery method preferences," as this claim element requires. Appx149. More specifically, the Motion asserts that "Plaintiff points to the alleged existence of contact information fields (such as email address and phone number)" as evidence that this limitation is practice by Lead Ads, and goes on to aver that "[s]imply alleging the existence of contact information is insufficient because the '101 Patent makes clear that 'contact information' is not the same as 'delivery method preferences.'" Appx149-Appx150. According to Meta, "'delivery method preferences' ***means*** a preferred method by which information is delivered to the recipient," which must be distinct from the contact information, itself. Appx150 (emphasis added).

Meta's position is flawed for several distinct reasons. First, it fails to accurately recount the allegations made by the FAC to which it admits are present. Second, Meta's analysis fails to account for the factual allegations present in Exhibit D to the FAC altogether. And third, Meta's analysis is expressly couched in the adoption of a narrow construction for "delivery method preference" at the pleadings stage which it then hides behind to justify disregarding Adnexus's infringement

theory. Unfortunately, the District Court did not recognize these flaws in Meta's Motion when viewing the evidence and arguments before it, and therefore reached the wrong outcome.

The FAC included factual allegations within both Exhibits B and D to it plausibly showing practice of Element [1f] by Lead Ads. In Exhibit B, Adnexus alleges that a "cookie" is stored on the user's device which indicates that the user has a Facebook profile. Appx101. Using the cookie, this user profile can be looked up and information about the user can be pulled from it. Appx101. The categories of information within these user profiles include the following:

| Contact fields | User information | Demographic questions | Work information |
|---|---|---|---|
| • Email address<br>• Phone number<br>• Street address<br>• City<br>• County/region<br>• County<br>• Country<br>• Postcode<br>• Postcode | • Full name<br>• First name<br>• Last name | • Date of birth<br>• Gender<br>• Marital status<br>• Relationship status<br>• Military status | • Job title<br>• Work phone number<br>• Work email address<br>• Company name |

**Source:** (https://en-gb.facebook.com/business/help/438193446367413?id=735435806665862)

Appx102

The categories of information shown include several that relate to how the user may be contacted, and that would, therefore, be usable to discern the user's

preference for how additional information may be delivered to it. For example, the user profile could include one or more email address(es), physical address(es), phone number(s), or work contact information. Importantly, each of these fields are optional rather than required. As such, by choosing which of these fields to populate (or not populate), preferences of the user on how they prefer to receive information can be discerned. The contact information provided corresponds to desired modes of communication preferred by the user.

Beyond that, by choosing which specific email address, phone number, or physical address to include with their profile, a user is again indicating a preference on how to be contacted. By way of example, a user may decide to include an email address for use by Facebook (which would then be provided to advertisers using Lead Ads). The email address they provide may be a personal email address, rather than a work email. Among their personal emails addresses, which it is common to have more than one nowadays, the user may choose to use the particular email address that they do (or do not) sync with their phone to receive regular notifications.

In addition to the foregoing, the FAC also includes citations to discussion of the availability of advertisers to ask users direct, custom questions through Lead Ads:




**Source:** (https://www.facebook.com/business/ads/lead-ads)

Appx102

Based upon the foregoing allegations and supporting citation to Facebook's own literature affirming their substance, Adnexus has pled sufficient facts and evidence plausibly show that a user profile includes an indication of the user's delivery preference. Alternatively, these facts and citations permit the inference that such information is included with the user's profile and would be provided by Facebook to advertisers using the Lead Ads products. Otherwise, the value of Lead Ads as a targeted advertising tool is greatly diminished. There is little value to advertisers in a system that does not provide a means for engaging a potential customer that has positively interacted with their ad. These citations in the FAC, standing alone, are sufficient to provide Meta "fair notice" of the infringement claim and "the grounds upon which it rests" and to defeat Meta's Motion with respect to Element [1f]. *Disc Disease Sols. Inc. v. VGH Sols., Inc.*, 888 F.3d 1256, 1260 (Fed. Cir. 2018).

The FAC did not stop there, however. It also attached Adnexus's preliminary infringement analysis and explanation thereof as Exhibit D to the

FAC. Appx110-Appx126. This analysis was previously submitted to Meta prior to Adnexus's filing of it original complaint in this litigation as an attachment to correspondence sent by Adnexus to Meta. Appx77 at ⁋21. That analysis builds upon the allegations and evidence included within Exhibit B to the FAC, including by providing the following excerpt from Facebook's online guides relating to its use of cookies by Lead Ads:




Appx119; see, also, Appx120

Additionally, Exhibit D includes direct hyperlinks to several online guides, help pages, and the like that further describe features of Lead Ads and provide further support to Adnexus's allegations that "delivery method preference" information is ascertained from the information users choose to share with Facebook, and is conveyed to advertisers through Lead Ads. Many of these same

online sources are also hyperlinked in Exhibit B. For example, Exhibit D includes hyperlinks to the URL: https://www.facebook.com/business/news/lead-ads-launch. Appx123 ("Source 17"). There, Facebook describes its Facebook Lead Ads program as follows:

> When someone clicks on your lead ad, a form opens with the person's ***contact information automatically populated, based on the information they share with Facebook***, like their name and email address. Automatically populating the contact information that people share with Facebook makes filling in the form as fast as two taps: one click on the ad to open the form and another to submit the auto-filled form. Like all of our ad types, lead ads were built with privacy in mind. ***People can edit their contact information before submitting the form, and this information isn't sent to the business until a person clicks "submit***." Emphasis added.

In this disclosure, Meta reveals that there will be many "delivery methods" used by Facebook, all based on information provided by the Facebook user, namely, for example, email or phone. These are preferences provided by the user and recognized by Facebook as contact preferences and these are used by Facebook and supplied to advertisers to be used in contacting the potential customer.

Exhibit D also links to URL: https://en-gb.facebook.com/business/help/829597887147190?id=735435806665862. Appx122 ("Source 14"). This webpage describes the Lead Ads data that Facebook collects and may use to pre-fill future instant forms that users may complete, including information on the specific, preferred delivery methods the user shares

with Facebook which can be used in connection with Lead Ads and other Facebook products and services.

Again, these allegations show that a Facebook user decides which specific means for contacting them are desired through, at least, opting to provide certain information to Facebook and by choosing which among their various phone numbers, email addresses, and the like they share. In the context of deciding a Motion to Dismiss at the pleadings stage, Adnexus is entitled to have this evidence viewed in the light most favorable to it, along with any and all reasonable inferences based upon it. *Disc Disease*, 888 F.3d at 1260. The District Court failed to consider the entirety of the evidence and allegations within the FAC regarding Element [1f], ignoring Exhibit D completely, and failed to view the limited evidence it did consider in the light most favorable to Adnexus.

To the extent that Meta bases its argument on factual disputes involving how the workings of the Accused Products compare to the claim elements (See, *Unification Techs, LLC v Dell Techs, Inc.*, No. 6:20-CV-00499-ADA, 2021 WL 1343188 (W.D. Tex. Jan 28, 2021), these are arguments that require claim construction. Indeed, Meta's Motion seems to expressly affirm the same, averring that "'delivery method preferences' are distinct from simple 'contact information'" and that "these two terms cannot have ***the same meaning***." Appx150. Apart from being premised on an oversimplification of the allegations of the FAC, and apart

from limiting the consideration of the FAC to only the allegations of Exhibit B, it is clear that Meta's position is couched in an interpretation of "delivery method preference" that is rigidly confined to only encompass the embodiment shown in Figure 2 of the '101 Patent:




Appx16 (Fig. 2 of '101 Patent) (annotations added)

Indeed, Meta excerpts a portion of this Figure into its Motion in connection with arguing that a delivery method preference can only be obtained by soliciting a direct "this-or-that" choice from the user upon presentation of a list of all possible means of communication available. Appx150. Nothing in the specification of the '101 Patent mandates such a narrow interpretation of "delivery method preference" or, moreover, how that information can be obtained from a user. Rather, the '101 specification includes disclosure undeniably broader than this narrow

interpretation. It expressly contemplates "gathering a recipient's email address" as a means of obtaining a preferred information delivery method:

> advertising. What is needed is a system and method of gathering a recipient's email address, or other preferred information delivery method, and sending targeted advertisements via this delivery method in response to the recipient's subsequent requests for information made through simple interactions with a banner advertisement while browsing the Internet.

Appx90 at 1:38-44.

Further description indicates that information solicited from an advertiser may be delivered via an email to an address that "the recipient has logged and registered through previous interaction":

> tising content from the banner server **108**. The banner server **108** then sends a banner advertisement that allows the recipient to request additional information about the product or service being displayed on the banner. In an exemplary embodiment, this additional information is delivered to the recipient as an e-mail that the recipient has logged and registered through previous interaction with banner advertisements.

Appx90 at 2:57-64.

Additional discussion relating to discerning a delivery method preference based on the contact information that a user elects to provide when registering, setting up a profile, or otherwise are present throughout the specification. *See, e.g.*, Appx91 (at 4:11-17; 4:44-48); Appx92 (at 5:3-5; 5:36-52); Appx93 (at 7:49-63; 8:28-67). Finally, dependent claim 2 of the '101 Patent, which depends from and

further narrows Claim 1, requires “causing an interface option to be displayed in at least a portion of the advertisement, wherein the interface option includes a plurality of delivery methods ***selectable by the recipient***.” Appx94 at 10:2-4. Claim 1 must be construed in a manner that is broader than its dependent claims, including Claims 2 and 3, each of which include narrowing limitations of the type Meta imports into Claim 1.

Meta’s interpretation is both wrong and its adoption, to any degree, is premature at the pleadings stage and in connection with deciding a motion to dismiss. To that end, Meta’s full claim construction positions should not be fully addressed until Adnexus has had an opportunity to review Meta’s (as of now inaccessible) firmware and related documents. As the Federal Circuit stated in *McZeal v Sprint Nextel Corp.* 501 F.3d 1354, 1357-58 (Fed. Cir. 2007):

> “At this stage in the litigation, all McZeal has access to is Sprint Nextel's public statements and advertisements. From this information he has fashioned his complaint. In this case, the specifics of how Sprint Nextel's purportedly infringing device works is something to be determined through discovery.”

Even though more detailed information will be evident through discovery, from the cited published descriptions of Meta’s Lead Ad program used by Meta to sell its Lead Ads program to its advertisers, Adnexus has provided more than sufficient factual content that states a legally cognizable claim that is plausible. At the pleading state, the Court is not to evaluate the plaintiff’s likelihood of success.

*Panasonic Corp. v. Magna Int'l., Inc.*, 6:21-cv-00319-ADA, 2022 WL 174513, at *1 (W.D. Tex. Feb 20, 2022) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Plaintiff is not required to provide evidence of infringement at the pleading stage beyond "stat[ing] a claim to relief that is plausible on its face." *Id.*

The FAC far exceeds this standard. Accordingly, the District Court's Order dismissing Adnexus's FAC is not legally or factually supported, and should be reversed. See *Bot M8 LLC v. Sony Corp. of Am.*, 4 F.4th 1342, 1353 (Fed. Cir. 2021). Adnexus has plausibly stated a claim for patent infringement and is entitled to the opportunity to continue its investigation and further develop its infringement contentions in discovery.

## III. PROSECUTION HISTORY ESTOPPEL DOES NOT BAR DOCTRINE OF EQUIVALENTS FOR ELEMENT [1f]

The District Court concluded that prosecution history estoppel precluded the Appellant from asserting its theory that, at a minimum, a user's election to provide only certain contact information for use by Facebook in connection with its Lead Ads products and services showed that user profiles comprise a delivery method preference for users. Specifically, the Order states:

> "Plaintiff next argues that it has alleged and cited information sufficient to support infringement of the delivery method preferences limitation. ECF No. 21 at 9-10. In doing so, it equates pre-filled forms based on specific contact information as equivalent to the user's delivery method preference. However, ***the prosecution history precludes Plaintiff from relying on the doctrine of equivalents.*** And the Court finds contact information sufficiently distinct from delivery

> method preferences to find that Plaintiff's allegations insufficient to state a plausible claim for direct infringement. Appx9.

Neither the Order, nor Meta's Motion provide any basis for the Court having reached this erroneous conclusion, however.

Meta's Motion makes a single citation to the prosecution history for the '101 Patent in connection with argument presented on other elements of Claim 1, wholly disconnected from Element [1f]. Appx142; Appx147. In each instance, Meta quotes the following remark which is presented as patentee's attempt to distinguish certain prior art because they: "fail to disclose 'determining, in response to the receiving the indication, whether an identifier containing unique identifying information about the recipient is present on the computing device,' and ***subsequently performing alternate method steps based on that determination***." Appx142 (emphasis in original). Neither the quoted remarks nor Meta's arguments made in reliance on them have anything to do with the permissible scope of "contact information" or "delivery method preference," whatsoever. No other remarks from the prosecution history are raised by Meta or identified in the Court's Order. Yet, the District Court found, without explanation, that Adnexus was foreclosed from asserting any infringement theory under the Doctrine of Equivalents with respect to Element [1f]. Appx9.

This is an incorrect finding that is not supported by anything within the prosecution history of the '101 Patent. Importantly, claim 1 was never amended

during prosecution. Compare Appx244-Appx245 ("New" claim 18 first presented), Appx383 (claim 18 issues as claim 1 of '101 Patent); with, Appx94 (issued claim 1). It proceeded to issuance in precisely the same form as it was originally presented. There is virtually no specific discussion of Element [1f] in any of the few Office Actions and Responses within the file history. No basis exists for the blanket application of prosecution history estoppel as to any limitation of Claim 1, and certainly no basis for its application with respect to Element [1f] at the pleadings stage to justify dismissing Adnexus's complaint in its entirety.

To the extent the Court's finding was made in reliance on the one excerpt cited by Meta's Motion, reproduced below, it is notable that these remarks were cited in regard to a separate limitation ("wherein the advertisement contains an interactive element displayed within the advertisement") for which the FAC was not found deficient:

> Additionally, claim 18 recites the performance of alternate method steps based on the determination of whether identifying information about a recipient is present on the recipient's computing device. Elliot and Crespo, even when combined, fail to disclose performing every method step recited in the decision tree of claim 18. For example, none of the portions of Elliot or Crespo cited by the Examiner disclose "causing a text field to be displayed in at least a portion of the advertisement" when identifying information about a recipient is not present on the recipient's computing device. ***Although Crespo discloses that a customer may enter an email address into a field on a checkout confirmation page (Fig. 10), this field is (i) not displayed in a portion of an advertisement and (ii) is not displayed in response to a determination that identifying information is not present on a recipient's computing device.*** Accordingly, even when combined,

> Elliot and Crespo fail to disclose all of the recited features of the claims. Appx359 (emphasis added).

To the extent these remarks are construed to expressly distinguish prior art, they do not do so based on any interpretation of "delivery method preference." No prosecution history was cited that relates to or restricts the interpretation of "discovery method preference" in the manner applied by the District Court, or that would preclude Adnexus from going forward under an infringement theory under the doctrine of equivalents.

## IV. DISMISSAL WITH PREJUDICE NOT WARRANTED

Meta's request to dismiss Adnexus's Complaint with prejudice is unsupported and meritless. Appx12. Contrary to Meta's assertions and as stated above, Adnexus has plausibly pleaded a claim of direct infringement. There was insufficient basis to dismiss Appellant's First Amended Complaint, at all, much less to dismiss it with prejudice. In doing so, the District Court is effectively finding that the accused Lead Ad products do not infringe claim 1 of the '101 Patent and does so despite there being no evidence in the record on which that conclusion could be based. Meta has not yet even answered the FAC or contended that the Lead Ads products do not infringe the '101 Patent. Instead, Meta's Motion only challenges whether the factual allegations included in the FAC are sufficient to meet the pleadings standard, while being otherwise silent as to how the accused Lead Ads products actually function.

The District Court reaches this "draconian remedy" and a "remedy of last resort" largely due to application of its Standing Order setting forth procedures for motions to dismiss practice. Appx62-Appx63; *F.D.I.C.*, 20 F.3d at 1380; *Batson*., 765 F.2d at 515; *Kuykendall*, 966 F.3d at 357. Pursuant to the Standing Order, the District Court affirmatively denies Plaintiffs leave to amend a complaint upon grant of a motion to dismiss on the basis that the conferral process freely permits Plaintiffs leave to amend their Complaint if done within one week of conferring with Defendant on any deficiency of the Complaint alleged by Defendant. In effect, Plaintiffs are given one opportunity to appease Defendant on all alleged deficiencies, without the benefit of the Court's consideration of the alleged deficiencies, then faces the all-or-nothing proposition of successfully defending against a first motion to dismiss filed with the District Court or have its claims dismissed with no further leave to amend.

In the context of a patent infringement litigation, this procedure greatly prejudices a patent owner plaintiff. In patent cases, the evidence of infringement is largely within the sole possession of the Defendant and inaccessible until discovery. Before that time, a Plaintiff may only rely on publicly available information in support of its claims for relief. Those publicly available sources rarely include all of the nuanced detail and granular information that will ultimately be required to show infringement as to every element of a claim. This is

especially so when the accused products or asserted claims implicate investigation of software or firmware to fully ascertain their functionality. This sits in stark contrast to the case law cited in the Standing Order in support of its blanket denial of leave to amend, neither of which were patent cases. *Herrmann Holdings Ltd. v. Lucent Techs., Inc.*, 302 F.3d 552, 557 (5th Cir. 2002) (breach of contract case in which Plaintiff was permitted two opportunities to amend its Complaint); *Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 308 (5th Cir. 2002) (claims arising from their conduct concerning a proposed merger).

Adnexus therefore respectfully requests that it be granted leave to amend, if the FAC is deemed insufficient in any regard by this Court, and have at least one opportunity to cure any such deficiencies after now having first received guidance from the Court on the sufficiency of the allegations presented in the FAC.

## CONCLUSION

For the foregoing reasons, Adnexus respectfully requests that this Court find that the allegations of the FAC were not insufficient to satisfy the pleadings standard, reverse the District Court's Order (Appx1-Appx11) in its entirety, and vacate the Final Judgment (Appx12) entered by the District Court.

Alternatively, in lieu of outright dismissal of its claims, Adnexus requests that it be granted leave to amend its FAC to include additional factual allegations

addressed to any deficiencies found to exist therein. To the extent the FAC is found deficient and leave to amend is not granted, Adnexus requests that the Final Judgment (Appx12) be vacated and the District Court be instructed to enter a judgment dismissing Adnexus's complaint without prejudice.

Dated: June 17, 2024

Respectfully submitted,

CHARLES S. COTROPIA
/s/ Charles S. Cotropia

State Bar No. 04858600
ccotropia@icloud.com
1756 Bison Meadow Lane
Heath, Texas 75032
Telephone: 214 725-1385

ATTORNEY FOR
APPELLANT

# ADDENDUM

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

**ADNEXUS INCORPORATED,**

***Plaintiff,***

**v.** **Case No. 6:23-CV-152-JKP**

**META PLATFORMS, INC.,**

***Defendant.***

**MEMORANDUM OPINION AND ORDER**

Before the Court is an Opposed Motion to Dismiss (ECF No. 17) filed by Defendant Meta Platforms, Inc. Pursuant to Fed. R. Civ. P. 12(b)(6), Defendant seeks to dismiss Plaintiff's First Amended Complaint (ECF No. 16). Plaintiff has filed a response (ECF No. 21), and Defendant has filed a reply (ECF No. 22). After considering the motion, related briefing, and applicable law, the Court grants the motion.

## I. BACKGROUND

After Defendant complied with this Court's Standing Order (ECF No. 7), Plaintiff filed its First Amended Complaint ("FAC"). The patent-in-suit at issue in this case is "United States Patent No. 8,719,101 ("the '101 Patent"), entitled 'System and method of on-line advertising.'" *See* ECF No. 16 ¶ 12. Plaintiff attached the relevant patent as Exhibit A to its FAC. *See* ECF No. 16-1. Its Abstract identifies the patent as:

> A system and method according to which an advertisement associated with a first party that contains an interactive element displayed within the advertisement is displayed to a recipient in a network communication associated with a second party, an interface option within the advertisement is displayed as a result of an interaction by the recipient with the interactive element, contact information in the interface option is received from the recipient, and the contact information is stored in a database.

*Id.* Plaintiff identifies the "Accused Instrumentalities" or "Accused Products" as Defendant's

"Meta Lead Ads," and provides a link to a guide for such ads. *See* ECF No. 16 ¶ 15.

Plaintiff asserts that Defendant has directly infringed "literally and/or under the doctrine of equivalents, one or more claims, including without limitation at least claim 1 of the '101 Patent, by making, using, testing, selling, offering for sale and/or importing into the United States Defendant's Accused Products." *Id.* ¶ 17. Plaintiff further asserts that Defendant has indirectly infringed the '101 Patent through inducement and has engaged in contributory, as well as willful infringement. *See id.* ¶¶ 18, 24. As an attachment to its FAC, it provides a claim chart that "describes how the elements of an exemplary claim 1 from the '101 Patent are infringed by the Accused Products. *See id.* ¶ 29; ECF No. 16-2 (Ex. B). According to Exhibit B, Plaintiff's claim comprises of nine elements (denoted as [1a] through [1i]). Defendant takes the information from the claim chart and puts it into a more readable paragraph structure. *See* ECF No. 17 at 4-5. The Court has no need to restate all elements here. Because Plaintiff has voiced no objection or concern about the more readable format, the Court will rely on it.

Unsatisfied with the factual allegations of the FAC, Defendant moved to dismiss this action on grounds that the FAC fails to state a claim for either direct or indirect infringement. With respect to the alleged direct infringement, Defendant contests the sufficiency of Plaintiff's allegations as to elements [1d], [1e]. [1f], and [1h]. *See* ECF No. 17 at 8-15. As to the alleged indirect infringement, Defendant first argues that such infringement claims necessarily fails when there is no direct infringement. *Id.* at 16. More specifically for the alleged induced infringement, Defendant argues that Plaintiff has made insufficient allegations as to specific intent. *Id.* And for the alleged contributory infringement, Defendant argues that Plaintiff has made insufficient factual allegations necessary to that specific type of infringement. *Id.* at 16-17. With the filing of the response and reply, the motion became ripe for ruling.

## II. PATENT LITIGATION

Patent cases differ from general civil litigation in multiple respects. One of which is that "Federal Circuit law governs questions involving substantive issues of patent law." *Grecia Est. Holdings LLC v. Meta Platforms, Inc.*, 605 F. Supp. 3d 905, 910 (W.D. Tex. 2022) (citing *Soverain Software LLC v. Victoria's Secret Direct Brand Mgmt., LLC*, 778 F.3d 1311, 1314 (Fed. Cir. 2015)). Nevertheless, procedural questions continue to be governed by regional circuit law. *See id.* Naturally, this means that Fed. R. Civ. P. 8(a) applies in the patent context. *See Bot M8 LLC v. Sony Corp. of Am.*, 4 F.4th 1342, 1352 (Fed. Cir. 2021) (applying Rule 8). Further, "the law of the respective regional circuit" governs the procedural issue of whether to grant or deny a motion to dismiss. *Disc Disease Sols. Inc. v. VGH Sols., Inc.*, 888 F.3d 1256, 1259 (Fed. Cir. 2018); *Bascom Global Internet Servs., Inc. v. AT & T Mobility LLC*, 827 F.3d 1341, 1347 (Fed. Cir. 2016). Moreover, the familiar standards for stating a claim set out in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) apply regardless of the governing circuit law. *See Bot M8*, 4 F. 4th at 1352 (applying *Iqbal/Twombly* in patent context); *Grecia*, 605 F. Supp. 3d at 909 (same). Consequently, this Court's normal standard for motions to dismiss applies here. But to show that the Federal Circuit would apply the same standard in any event, the Court supplements its normal standard with some citations to Federal Circuit precedent.

## III. MOTION TO DISMISS

Pursuant to Fed. R. Civ. P. 12(b)(6), Defendant seeks to dismiss all claims asserted by Plaintiff. Under Rule 12(b)(6), litigants may move to dismiss asserted claims for "failure to state a claim for which relief can be granted." As required by Fed. R. Civ. P. 8(a)(2), every pleading that states a claim for relief must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Such requirement provides opposing parties "fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)); *accord Bot M8 LLC v. Sony Corp. of Am.*, 4 F.4th 1342, 1353 (Fed. Cir. 2021).

In general, a court addressing a motion under Rule 12(b)(6) "must limit itself to the contents of the pleadings, including attachments thereto." *Brand Coupon Network, LLC v. Catalina Mktg. Corp.*, 748 F.3d 631, 635 (5th Cir. 2014) (citation omitted). Nevertheless, when a pleading refers to documents that are central to a claim, the Court may consider such documents if attached to the motion to dismiss. *Lone Star Fund V (U.S.), LP v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010); *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000).

It is also "clearly proper . . . to take judicial notice of matters of public record" when deciding a Rule 12(b)(6) motion. *Norris v. Hearst Trust*, 500 F.3d 454, 461 n.9 (5th Cir. 2007). Communications with the Patent Trial and Appeal Board ("PTAB") and prosecution histories are matters of public record that "are subject to judicial notice and appropriate for this Court to consider at the pleading stage." *Grecia Est. Holdings LLC v. Meta Platforms, Inc.*, 605 F. Supp. 3d 905, 915 (W.D. Tex. 2022) (citing, inter alia, *Data Engine Techs. LLC v. Google LLC*, 906 F.3d 999, 1008 n.2 (Fed. Cir. 2018); *Uniloc USA, Inc. v. ADP, LLC*, 772 F. App'x 890, 898 n.3 (Fed. Cir. 2019)). This Court thus can and does take judicial notice of the file history of '101 Patent that Defendant provides with its motion as Exhibit 3. Because the Court has no reason to consider the other attachments to the motion to dismiss, it will not consider them and thus has no need to determine whether they are properly before the Court on a motion to dismiss.

When ruling on a motion to dismiss, courts "accept all well-pled facts as true, construing all reasonable inferences in the [operative pleading] in the light most favorable to the plaintiff." *White v. U.S. Corr., LLC*, 996 F.3d 302, 306-07 (5th Cir. 2021). But courts "do not accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions." *Heinze v. Tesco Corp.*, 971 F.3d 475, 479 (5th Cir. 2020) (citations and internal quotation marks omitted). "And

despite the natural focus on the allegations of the operative pleading, the party moving for dismissal under Rule 12(b)(6) has the burden to show that dismissal is warranted." *C.M. v. United States*, ___ F. Supp. 3d ___, ___, No. 5:21-CV-0234-JKP-ESC, 2023 WL 3261612, at *44 (W.D. Tex. May 4, 2023) (citing *Cantu v. Guerra*, No. SA-20-CV-0746-JKP-HJB, 2021 WL 2636017, at *1 (W.D. Tex. June 25, 2021)).

A well-pleaded pleading "may proceed even if it strikes a savvy judge that actual proof of [the alleged] facts is improbable, and 'that a recovery is very remote and unlikely.'" *Twombly*, 550 U.S. at 556 (citation omitted). Nevertheless, parties asserting a claim must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555; *accord Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (emphasizing that "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions"); *accord Bot M8*, 4 F.4th at 1352. Parties need not plead the legal basis for a claim, but they "must plead facts sufficient to show that [the] claim has substantive plausibility." *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 12 (2014) (per curiam). And they satisfy that standard when they allege "simply, concisely, and directly events" that are sufficient to inform the defendant of the "factual basis" of their claim. *Id.*

Facts alleged by the plaintiff must "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

> To withstand a motion to dismiss under Rule 12(b)(6), a complaint must present enough facts to state a plausible claim to relief. A plaintiff need not provide exhaustive detail to avoid dismissal, but the pleaded facts must allow a reasonable inference that the plaintiff should prevail. Facts that only conceivably give rise to relief don't suffice. Thus, though we generally take as true what a complaint alleges, we do not credit a complaint's legal conclusions or threadbare recitals of the elements of a cause of action.

*Smith v. Heap*, 31 F. 4th 905, 910 (5th Cir. 2022) (quoting *Mandawala v. Ne. Baptist Hosp.*, 16 F.4th 1144, 1150 (5th Cir. 2021)); *accord Bot M8*, 4 F.4th at 1352. As *Twombly* states, to avoid

dismissal under Rule 12(b)(6), plaintiffs must allege facts that "nudge" an asserted claim "across the line from conceivable to plausible." 550 U.S. at 570. The focus is not on whether the party asserting the claim will ultimately prevail, but whether that party should be permitted to present evidence to support adequately asserted claims. *Id.* at 563 n.8; *Skinner v. Switzer*, 562 U.S. 521, 529-30 (2011).

Further, determining plausibility is a "context-specific task," that courts perform in light of their "judicial experience and common sense." *Iqbal*, 556 U.S. at 679; *accord Bot M8*, 4 F.4th at 1352. "The level of detail required in any given case will vary depending upon a number of factors, including the complexity of the technology, the materiality of any given element to practicing the asserted claim(s), and the nature of the allegedly infringing device." *Bot M8*, 4 F.4th at 1353, *see also U.S. ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009) (recognizing that some claims simply require less factual detail to state a claim upon which courts may grant relief).

**III. ANALYSIS**

The parties disagree as to whether Plaintiff has alleged sufficient facts to survive Defendant's Rule 12(b)(6) motion to dismiss. Defendant aptly sets out this disagreement in its reply brief when it argues that Plaintiff relies on an incorrect pleading standard. *See* ECF No. 22 at 1-2. But Defendant goes too far when it argues that Plaintiff advocates for a pleading standard so permissive that it is sufficient to allege "I have a patent, and your product infringes its claims." *See id.* Plaintiff does not argue for such a standard. It instead relies on *Bot M8*'s recognition that the required level of detail will vary and must be judged on a case-by-case basis. That is the proper benchmark. The question is whether under the circumstances of this case, Plaintiff has made sufficient factual allegations.

In general, direct infringement arises when, without authorization, one "makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States

any patented invention during the term of the patent." 35 U.S.C. § 271(a). Because "[a] method patent claims a number of steps . . . the patent is not infringed unless all the steps are carried out." *Limelight Networks, Inc. v. Akamai Techs., Inc.*, 572 U.S. 915, 921 (2014).

"To prove infringement, the patentee must show that the accused device meets each claim limitation either literally or under the doctrine of equivalents." *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 812 (Fed. Cir. 2002). Both of these methods for showing infringement are questions of fact. *See id.* But "[l]iteral infringement requires the patentee to prove that the accused device contains each limitation of the asserted claim," whereas "[i]nfringement under the doctrine of equivalents requires the patentee to prove that the accused device contains an equivalent for each limitation not literally satisfied." *Id.* Notably, "a patentee cannot narrowly claim an invention to avoid prosecution scrutiny by the PTO, and then, after patent issuance, use the doctrine of equivalents to establish infringement because the specification discloses equivalents." *Johnson & Johnston Assocs. Inc. v. R.E. Serv. Co.*, 285 F.3d 1046, 1054 (Fed. Cir. 2002) (en banc). Thus, when, as is the case here, the prosecution history suggests that a limitation served to limit the scope of examination so as to obtain the patent, the patentee cannot utilize the doctrine of equivalency to support a claimed infringement. *Ottah v. Fiat Chrysler*, 884 F.3d 1135, 1141 (Fed. Cir. 2018).

Naturally, a plaintiff "need not prove its case at the pleading state." *Nalco Co. v. Chem-Mod, LLC*, 883 F.3d 1337, 1350 (Fed. Cir. 2012) (citation and internal quotation marks omitted). At this stage, proof of infringement is not at issue. Rather, the question is whether Plaintiff sufficiently placed Defendant "on notice for possible direct infringement, regardless of whether [Plaintiff] specifically listed every product that was infringing." *Iron Oak Techs., LLC v. Acer Am. Corp.*, No. 6:17-CV-00143-RP-JCM, 2017 WL 9477677, at *3 (W.D. Tex. Nov. 28, 2017) (recommendation of Mag. J.) *accepted by unpub. order Iron Oak Techs., LLC v. Acer Am. Corp*, No. 3:18-

CV-1543-M (N.D. Tex. July 5, 2018) (after transfer for multi-district litigation). The "fair notice" standard requires factual allegations which show that "each and every limitation set forth in a claim appears in the accused product." *Id.*; *accord Grecia Est. Holdings LLC v. Meta Platforms, Inc.*, 605 F. Supp. 3d 905, 909 (W.D. Tex. 2022).

Plaintiff's alleged direct infringement relates to Meta Lead Ads, the only identified accused product. Defendant challenges the factual sufficiency of four elements ([1d], [1e]. [1f], and [1h]) of the direct infringement claim. ECF No. 17 at 8-15. The Court need not consider each element because if the FAC lacks sufficient facts as to any one of the elements, the entire claim fails for lack of factual sufficiency. *See Grecia*, 605 F. Supp. 3d at 909.

Here, the FAC lacks sufficient factual allegations to support the delivery-method-preferences limitation set out in element [1f]. That element requires that Meta Lead Ads "retriev[es] a user profile associated with the recipient from a visitor information database using at least a portion of the identifier, wherein the user profile comprises at least delivery method preferences and demographic information." *See* ECF No. 16-2 at 6-7. As Defendant points out, Plaintiff makes no allegation that Meta Lead Ads retrieves any user profile that includes any delivery method preferences. ECF No. 17 at 12-13.

Plaintiff first responds that Defendant's argument is premature and should occur after claim construction. ECF No. 21 at 9. But claim construction does not dispense with the pleading requirements to allege sufficient facts to survive a Rule 12(b)(6) motion to dismiss. *See Ortiz & Assocs. Consulting, LLC v. Ricoh USA, Inc.*, No. 6:21-CV-01178-ADA, 2023 WL 2904583, at *4 (W.D. Tex. Apr. 11, 2023) (dismissing direct infringement claim despite argument that claim construction was needed); *Bowmar Archery LLC v. VIP Veteran Innovative Prod. LLC*, No. 1:22-CV-00346-RP, 2023 WL 28438, at *3-4 (W.D. Tex. Jan. 3, 2023) (recommendation of Mag. J.) (recommending Rule 12(b)(6) dismissal despite argument that determining the meaning of a term "is

entirely inappropriate at the pleading stage") *adopted by* 2023 WL 2311988 (W.D. Tex. Jan. 18, 2023).

Plaintiff next argues that it has alleged and cited information sufficient to support infringement of the delivery-method-preferences limitation. ECF No. 21 at 9-10. In doing so, it equates pre-filled forms based on specific contact information as equivalent to the user's delivery method preference. However, the prosecution history precludes Plaintiff from relying on the doctrine of equivalents. And the Court finds contact information sufficiently distinct from delivery method preferences to find that Plaintiff's allegations insufficient to state a plausible claim for direct infringement. This finding does not require claim construction. This is not a case of inconsistent direct infringement contentions, *see Unification Techs. LLC v. Dell Techs., Inc.*, No. 6:20-CV-00499-ADA, 2021 WL 1343188, at *3 (W.D. Tex. Jan. 28, 2021) (finding that "a 12(b)(6) motion is not the appropriate procedure for identifying inconsistent direct infringement contentions"), but rather, this case lacks sufficient factual allegations under the circumstances. Accordingly, the FAC fails to state a claim for direct infringement upon which relief can be granted.

The Court thus turns to the claims of indirect infringement. "To state a claim for indirect infringement . . . a plaintiff need not identify a *specific* direct infringer if it pleads facts sufficient to allow an inference that at least one direct infringer exists." *In re Bill of Lading Transmission & Processing Sys. Pat. Litig.*, 681 F.3d 1323, 1336 (Fed. Cir. 2012). "It is axiomatic that there can be no inducement or contributory infringement without an underlying act of direct infringement." *Nalco Co. v. Chem-Mod, LLC*, 883 F.3d 1337, 1355 (Fed. Cir. 2018) (citation and internal quotation marks omitted). Supreme Court precedent "leaves no doubt that inducement liability may arise 'if, but only if, [there is] . . . direct infringement.'" *Limelight Networks*, 572 U.S. at 921 (quoting *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 365 U.S. 336, 341 (1961)). In short, when

"there has been no direct infringement, there can be no inducement of infringement under [35 U.S.C.] § 271(b)." *Id.* at 922.

Because Plaintiff has failed to state enough facts to plausibly state a direct infringement claim, its indirect infringement claims also fail. Similarly, there can be no willful infringement absent direct infringement. *Nalco Co. v. Chem-Mod, LLC*, No. 14-CV-2510, 2015 WL 6122811, at *3 (N.D. Ill. Oct. 15, 2015) (dismissing a third amended complaint without prejudice); *see also*, *Nalco Co. v. Chem-Mod, LLC*, 883 F.3d 1337, 1345, 1357 (Fed. Cir. 2018) (recognizing reasoning for dismissal of third amended complaint and reversing dismissal of willfulness claim because the plaintiff had "adequately stated a direct infringement claim for at least some of the methods of infringement").

## IV. LEAVE TO AMEND

In general, the Court considers whether it should grant a plaintiff leave to amend when it has determined that dismissal is warranted. Leave to amend is not required, however, when plaintiffs have already pled their "best case." *See Brewster v. Dretke*, 587 F.3d 764, 768 (5th Cir. 2009) (per curiam). Whether to grant leave to amend is within the Court's sound discretion. *U.S. ex rel. Willard v. Humana Health Plan of Tex. Inc.*, 336 F.3d 375, 387 (5th Cir. 2003). Notably, a "party who neglects to ask the district court for leave to amend cannot expect to receive such a dispensation from the court of appeals." *Id.*

Plaintiff has not asked to amend its complaint. Moreover, according to Defendant's certificate of conference attached to the motion to dismiss, it complied with this Court's standing order, Plaintiff filed the First Amended Complaint in response, and Defendant views the amended pleading as still deficient. *See* ECF No. 17 at 20. The Court's Standing Order is intended to advance cases efficiently and to minimize the cost of litigation. *See* ECF No. 7 at 1. Through this Standing Order, "the Plaintiff has already been provided notice of the proposed deficiencies and the

opportunity to amend the pleading prior to the filing of a Motion to Dismiss." *Id*. Thus, "if the Court finds any Motion to Dismiss has merit, **the Plaintiff shall not be allowed an additional opportunity to amend its Complaint following a properly filed Motion to Dismiss**." *Id.* at 1-2 (citing *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002); *Herrmann Holdings Ltd. v. Lucent Techs. Inc.*, 302 F.3d 552, 567 (5th Cir. 2002)). Based upon all of the foregoing, the Court finds that Plaintiff has stated its best case and thus declines to exercise its discretion to permit the filing of another amended complaint.

## V. CONCLUSION

For the foregoing reasons, the Court **GRANTS** the Opposed Motion to Dismiss (ECF No. 17) filed by Defendant Meta Platforms, Inc. By separate document, the Court will enter final judgment dismissing this action with prejudice.

**SIGNED this 2nd day of February 2024.**

Jason Pulliam

**JASON PULLIAM**
**UNITED STATES DISTRICT JUDGE**

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

**ADNEXUS INCORPORATED,**

***Plaintiff,***

**v.** **Case No. 6:23-CV-152-JKP**

**META PLATFORMS, INC.,**

***Defendant.***

**FINAL JUDGMENT**

The Court has considered the issues presented in this action and rendered its decision. For the reasons stated in the Memorandum Opinion and Order issued contemporaneously with this Final Judgment, the Court **DISMISSES** this action with prejudice under Fed. R. Civ. P. 12(b)(6) for Plaintiff's failure to state a claim upon which relief can be granted. Plaintiff takes nothing from his claim against Defendant.

**SIGNED this 2nd day of February 2024.**

**JASON PULLIAM**
**UNITED STATES DISTRICT JUDGE**

# Exhibit A

# to

# Complaint for Patent Infringement

# The ’101 Patent

US008719101B1

(12) **United States Patent**
**Booth et al.**

(10) **Patent No.: US 8,719,101 B1**
(45) **Date of Patent: May 6, 2014**

(54) **SYSTEM AND METHOD OF ON-LINE ADVERTISING**

(75) Inventors: **Timothy L. Booth**, Murphy, TX (US); **Shawn Sandifer**, Frisco, TX (US)

(73) Assignee: **COR, Inc.**, Plano, TX (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 485 days.

(21) Appl. No.: **12/731,973**

(22) Filed: **Mar. 25, 2010**

**Related U.S. Application Data**

(60) Provisional application No. 61/163,132, filed on Mar. 25, 2009.

(51) **Int. Cl.**
***G06Q 10/00*** (2012.01)

(52) **U.S. Cl.**
USPC ........................................................ **705/14.73**

(58) **Field of Classification Search**
USPC ........................................................ 705/14.73
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | | |
|---|---|---|---|---|---|
| 6,496,857 | B1 * | 12/2002 | Dustin et al. | ... | 709/219 |
| 2003/0212745 | A1 * | 11/2003 | Caughey | ... | 709/206 |
| 2006/0149630 | A1 * | 7/2006 | Elliott et al. | ... | 705/14 |
| 2008/0040219 | A1 * | 2/2008 | Kim et al. | ... | 705/14 |
| 2011/0246593 | A1 * | 10/2011 | Crespo et al. | ... | 709/206 |

* cited by examiner

*Primary Examiner* — Naresh Vig
(74) *Attorney, Agent, or Firm* — Haynes and Boone, LLP

(57) **ABSTRACT**

A system and method according to which an advertisement associated with a first party that contains an interactive element displayed within the advertisement is displayed to a recipient in a network communication associated with a second party, an interface option within the advertisement is displayed as a result of an interaction by the recipient with the interactive element, contact information in the interface option is received from the recipient, and the contact information is stored in a database.

**4 Claims, 5 Drawing Sheets**




100
104
114
Computing Device
E-Mail Client
116
Web Page Server
112
108
Network
Banner Server
Client
106
102
Information Database
120
Analytics Server
110
E-Mail Advertisement Server

Fig. 1


150
152
http://www.yyy.zzz
168
154
Banner Advertisement
news
sales
offers
166
eHitme
text field
158
156
Banner
Ad
email
text
brow
IM
170
Website
Navigation
Website
Content
164
eHitme
160
162

Fig. 2


202
200
Present Banner Advertisement to Recipient
204
Is Visitor Regonized?
Yes
Load Recipient Preferences
206
No
208
Receive Preferred Delivery Method
Deliver Additional Information According to Preferences
210
212
Offer Recipient to Log Preferences
214
Recipient Response?
No
Yes
216
Receive and Log Preferences

Fig. 3


300
312
Display Banner Advertisement
316
Detect Mouseover from Recipient
326
Detect Mouseclick from Recipient
317
Cookie Placed?
No
End
Yes
328
Cookie Placed?
330
No
Display Additional Information in Browser
Yes
318
Open Text Balloon
320
Receive E-mail Address from Recipient
332
Send Additional Advertising Information to Recipient's E-mail Address
322
Send Confirmation Message to Recipient's E-mail Address
334
Track and Record Interaction with Recipient
324
Place Cookie on Recipient's Computing Device
336
Send Recipient's Contact Information to Vendor

Fig. 4


506
504
500
STORAGE DEVICE
INPUT DEVICE
512
514
MICROPROCESSOR
SYSTEM MEMORY
COMMUNICATION DEVICE
VIDEO CONTROLLER
DISPLAY
502
510
516
508

Fig. 5

# SYSTEM AND METHOD OF ON-LINE ADVERTISING

## CROSS REFERENCE TO RELATED APPLICATIONS

This application claims the benefit of the filing date of U.S. patent application No. 61/163,132, filed on Mar. 25, 2009, the disclosure of which is incorporated herein by reference.

## BACKGROUND

Internet advertising companies seek to find effective advertising methods to promote products and services to potential customers. One advertising method is displaying banner advertisements to recipients as part of a web page including images, text, and/or video promoting certain product and services. Banner advertisements are typically displayed to recipients to the web page hosting the banner, along with other information displayed by the content provider for the web page. A second internet advertising method is sending e-mail messages to potential customers. E-mail messages typically include images, text, and/or video promoting certain products and services, and generally allow more information to be conveyed than banners. E-mail messages that are not solicited by the recipient are much less effective as an advertising method than e-mails specifically requested by the recipient. Sending unsolicited emails raises the risks associated with non-encrypted electronic transmissions, spam filters, and the sharing of e-mail addresses without permission.

Both of the above advertising methods carry the risk on pushing numerous advertisements to potential customers that are not relevant or desired by the recipient. As a result, the potential customer builds an unfavorable image of the advertiser pushing such unwanted advertisements, or the vendor whose product and services are featured. For these reasons, certain vendors may be hesitant to participate in internet advertising. What is needed is a system and method of gathering a recipient's email address, or other preferred information delivery method, and sending targeted advertisements via this delivery method in response to the recipient's subsequent requests for information made through simple interactions with a banner advertisement while browsing the Internet.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a diagrammatic illustration of a system according to an exemplary embodiment.

FIG. **2** is an illustration of a browser interface for interaction with a banner advertisement according to an exemplary embodiment.

FIG. **3** is a flow chart illustration of an online advertisement delivery process conducted using the system of FIG. **1**.

FIG. **4** is a flow chart illustration of an online recipient tracking process conducted using the system of FIG. **1**.

FIG. **5** is a diagrammatic illustration of a node for implementing one or more exemplary embodiments of the present disclosure.

## DETAILED DESCRIPTION

In an exemplary embodiment, as illustrated in FIG. **1**, an advertising system **100** is shown. The advertising system **100** includes a network **102**, which is preferably the Internet but may be a private intranet, a local area network (LAN), a wide area network (WAN), an adhoc network, cellular network



including CDMA, GSM, and UMTS, a cable network. DSL network, fiber network, WiMAX network, or a combination of some or all of these networks, or any other suitable network. Communicating with and over the network **102** are a variety of servers, clients, and databases. The servers include a banner server **108**, an e-mail advertisement server **110**, a web page server **116**, and an analytics server **120**. Each of these servers may be implemented using hardware, software, or a combination of the two. The servers **108**, **110**, **116**, **120** may be separate from one another, or some or all of them may share computing resources such as data storage, network access, processing resources, memory, operating systems, virtual servers, software libraries, and the like. The servers may be controlled by one entity, or they may be under the control of separate entities. For example, the web page server **116** may be controlled by a web page content provider, while the banner server **106**, the e-mail advertisement server **108**, and the analytics server **120** may be controlled by an Internet marketing company.

The analytics server **110** is operably coupled to, and in communication with the network **102**. The analytics server **110** performs tracking of visitor interaction with banner advertisements and e-mail advertisements. The tracking data gathered by the analytics server **110** may be used by advertisers for business intelligence and financial analysis purposes, and to improve the delivery of advertising material.

The clients include a client **112** and an e-mail client **114**. A visitor's or other recipient's computing device **104** is operably coupled to, and in communication with, the client **112** and the e-mail client **114**. In an exemplary embodiment, the visitor's computing device **104** is any device capable of receiving and displaying a network communication over the network **102**. In several exemplary embodiments, the visitor's computing device **104** is a personal computer, interactive display device, mobile device, or the like. In an exemplary embodiment, the client **112** is web browser software executing on a personal computer, for example Microsoft Internet Explorer, Google Chrome, Mozilla Firefox, Apple Safari, or any other suitable web browser.

The banner server **104** provides advertising content to the browser client **112** and/or the web page server **116**. The banner server **108** may include multiple servers that provide redundant serving capacity for advertising content, and a server may be selected to provide advertising content to a particular recipient based on the geographic location of the recipient. In this way, the banner server **108** that is logically or physically nearest to the recipient can deliver the requested advertising content. The advertising content may be provided via hypertext transfer protocol or any other suitable protocol.

During operation of the system **100**, the browser client **112** communicates with one or more of the servers. As one example, the browser client **112** may request a web page or other network communication containing advertising content from the web page server **116**. In response, the web page server **116** provides the web page or other network communication and directs the browser client **112** to request advertising content from the banner server **108**. The banner server **108** then sends a banner advertisement that allows the recipient to request additional information about the product or service being displayed on the banner. In an exemplary embodiment, this additional information is delivered to the recipient as an e-mail that the recipient has logged and registered through previous interaction with banner advertisements.

In an exemplary embodiment, the provider of the banner advertisement determines the content and format of the e-mail pushed to recipient based on the topic of the banner

advertisement or preferences previously logged by the recipient. In this way, the system **100** allow the recipient to request or subscribe to delivery of information about specific products and services and to be matched with vendor that wishes to market those types of products and services.

In an exemplary embodiment, the provider of the banner advertisement generates a fee to be paid by the vendor of the product or service when the banner advertisement is shown to the recipient and/or when the recipient requests additional information. In an exemplary embodiment, the number of times the banner advertisement is shown and the number of times a recipient requests additional information is tracked and recorded by the analytics server **120**.

In an exemplary embodiment, the analytics server **120** tracks recipient behavior and measures the visitor's and other recipient's response to a variety of banner advertisements. The results of tracking this behavior can be used by advertisers to predict the banner advertisement content that will most likely lead to a sale of a product or service. The tracking may also track the content of the web page or other network communication displayed in connection with the banner advertisement, self-reported information from the recipient, and records of previous purchases or Internet activities stored within cookies or other identifiers retained on the visitor's computing device **104**. Advertisers may also use this behavior tracking to generate demographic profiles of recipients and to customize advertisement of products or services to future visitors based on those profiles.

FIG. **2** illustrates a browser interface **150** for interaction with banner advertisements **154** and **166** according to an exemplary embodiment. In an exemplary embodiment, the browser interface **150** is displayed on the visitor's computing device **104** by the browser client **112**. The browser interface **150** includes an address bar **152**, website navigation **160**, website content **162**, and banner advertisements **154** and **166**. In an exemplary embodiment, the website navigation **160** and the website content **162** are provided by a third party owner of the web page associated with the domain name in the address bar **152**.

Banner advertisements **154** and **166** can be displayed as a shape with any given dimensions, and may even change dimensions, but are typically rectangular areas anchored to a specific area on a web page or network communication. The banner advertisements **154** and **166** provide the visitor with a variety of information corresponding to various products from any number of vendors. In an exemplary embodiment, the banner advertisements **154** and **166** allow the visitor or other recipient to request additional information be delivered to the recipient by the advertiser, the vendor of the advertised products and services, or another third party. In an exemplary embodiment, the banner advertisements **154** and **166** supply information regarding sales, comparisons, new features, and other types of advertising messages.

In an exemplary embodiment, the banner advertisement **154** allows a recipient to request an email or other electronic communication be sent to the recipient's email address containing information about the product or service advertised. In an exemplary embodiment, recipients interact with banner advertisements **154** and **166** by interacting with interactive elements within the banner advertisements such as areas denoted by a logo **156** and **164**. The interactive logos **156** and **164** can be resident in an existing banner of any size. When activated, the interactive logos **156** and **164** provide an interface option to allow a recipient to provide contact information or automatically send advertising or other information to the recipient's email address, or other contact method, without immediately delivering such information in the browser client **112**.

Visitors and other recipients may activate interactive logos **156** or **164** by clicking, hovering over the interactive logos **156** or **164** for a predetermined time, or other known method or activation. In one embodiment, a visitor has not previous interacted with the system **100**. In this embodiment, activating interactive logo **156** causes an interface option, such as a text field **158**, to appear.

Visitors and other recipients may type in contact information, such as an email address into a text field **158**. In an exemplary embodiment, the recipient initiates an e-mail registration process by entering his email address into the text field **158**. The recipient may then complete the e-mail registration process by selecting an opt-in option in a confirmation email that is sent to the recipient's email address. The recipient may be warned the confirmation email might be delivered to his spam box. After the recipient completes the e-mail registration process though the confirmation email; a cookie or other identifier is placed on the recipient's computer. The placement of cookie allows enhanced interaction between the recipient and the banner advertisement **154** and **166**, as further described below.

In several exemplary embodiments, when the cookie other identifier is present and the recipient subsequently clicks or mouse over banner advertisement **154**, code within the banner will trigger the delivery preferences **168** to give the option to the recipient to subscribe to regular periodic delivery of additional information regarding the subject of the banner advertisement **154**. In an exemplary embodiment, the information preferences **168** in banner advertisement **154** include a radio button with types of additional information that the recipient may select, such as "newsletter," "sales," and/or "special offers."

In an exemplary embodiment, recipients have previously registered their email address through the online registration mechanism described above by way of text balloon **158** to activate the clickable logos **156** and **164**. In this way, banner advertisements **154** and **166** deliver advertising or other information in a timely and unobtrusive manner without the recipient leaving the website hosting the banner advertisements **154** or **166** or otherwise interrupting the recipient's browsing.

In an exemplary embodiment, after completing the registration process and placing the cookie, the recipient may mouse over the banner advertisement **166** and select a delivery preference **170** to have the additional information delivered via text message, browser, or instant messaging service.

Referring now to FIG. **3**, with continuing reference to FIG. **1** and FIG. **2**, an example operational process **200** for delivering online advertisements is shown. At step **202**, the banner advertisement **154** or **166** is presented to the recipient's browser client **112** by the banner server **108**. At step **204**, the banner server **108** determines whether or not the recipient can be recognized by a cookie or other identifier placed on the visitor's computing device **104**.

If the recipient is recognized, the banner server **108** loads the recipient preferences from the visitor information database **106**. If the recipient is not recognized, the recipient is presented an interface option, such as a text field **158**, in the banner advertisement **154** or presented a delivery method preference selection **170** in the banner advertisement **166**. At step **210**, additional information is delivered to the visitor's browser client **112**, the visitor's e-mail client **114**, or via other means to the to visitor's computing device **104**. In an exemplary embodiment, the recipient remains able to interact with the entire webpage displaying the banner advertisement **154**

or **166** without pop-up of additional web pages, network communications, or other interruption.

At step **212**, the recipient is given the option to enter delivery preferences for future deliveries of additional information. In an exemplary embodiment, these preferences include an option to subscribe to further e-mailings from certain selected vendors and advertisers. In another exemplary embodiment, these preferences include an option to subscribe to further e-mailings regarding certain selected types of products or services, irrespective of the vendor. In this way, the process **200** targets advertising to potential consumers who have opted-in to receive it.

At step **214**, the process determines whether or not a response to the request for delivery preferences has been received. If a response is not received from the recipient, the process returns to step **202**. At step **216**, if the recipient enters delivery preferences, the preferences are received and stored in the recipient information database **106** and a cookie is placed on the visitor's computing device **104** so that the recipient will be recognized by the process **200** in the future.

Referring now to FIG. **4**, with continuing reference to FIG. **1** and FIG. **2**, an example operational process **300** for tracking recipients is shown. At step **312**, a banner advertisement **154** or **170** is presented to the recipient's browser client **112** by the banner server **108** during a visit to a third party network communication provided by the web page server **116**.

At step **316**, a mouseover action on top of the banner advertisement **154** is detected by the banner server **108** or the web page server **116**. At step **318**, an interface option, such as the text field **158**, is presented, opened or activated on the banner advertisement **154**. At step **320**, using his or her browser client **112**, the recipient enters his or her email address into the text field **158**. At step **322**, the email advertisement server **110** send a confirmation email to the recipient's email client **114** using the entered email address.

The confirmation email may also contain an option to create a user profile for the recipient. In an exemplary embodiment, to create the profile, the recipient may enter additional preferences and contact information in the confirmation email, such as a name, a cellular phone number or an instant message screen name. In an exemplary embodiment, the use profile is stored on the visitor information database **106**. In several exemplary embodiments, the user profile allows a recipient to opt-in to future updates concerning the advertised product or to allow future email marketing on related items that match the recipient's demographic or request history. In an exemplary embodiment, once a recipient has created a profile, the recipient can manage the user profile by interaction with another website manages by the advertiser or a third party. In an exemplary embodiment, management includes changing privacy and contact preferences. Subject to the preferences set on the user profile, the recipient's contact information is sent to any number of advertisers or vendors.

The website used to manage the recipient's user profile may also record the types of information sent by advertisers to the recipient, or act as a delivery service for said information. The cookie and/or website may also track and record the number of successful clicks and click-through percentage for banner advertisements **154** and **166** in order to send relevant information to vendors. In an exemplary embodiment, the vendor of the product or services pays the vendor based on the interactions of recipient with the banner advertisements **154** and **166**.

At step **324**, a cookie or other identifier is placed on the visitor's computing device **104** contain unique identifying information for that recipient.

At step **326**, a mouseclick action on top of logo **156** or **164** within the banner advertisement **154** or **166** is detected by the banner server **108** or the web page sever **116**. At step **328**, the banner server **108** determines whether or not a cookie or other identifier containing unique identifying information for the recipient has been placed on the visitor's computing device **104**. If no cookie is present, additional information regarding the subject of the banner advertisement **154** or **166** is displayed to the recipient's browser client **112**.

At step **332**, if a cookie is present on the visitor's computing device **104**, the additional advertising information is sent to the e-mail client **114**. At the step **334**, the recipient's request for additional advertising information is recorded by the analytics server **120**. In an exemplary embodiment, the data recorded by the analytics server **120** is associated with the unique identifying information stored in the cookie, allowing recipient's individual interactions with banner advertisements **154** and **166** to be tracked. At step **336**, this recording and recipient tracking data gathered by the analytics server **120** may be shared with third party vendors or other advertisers. In an exemplary embodiment, the recipient may select which vendors have access to this data by adjusting settings in his or her user profile.

Referring to FIG. **5**, an illustrative node **500** for implementing one or more embodiments of the present disclosure is depicted. Node **500** includes a microprocessor **502**, an input device **504**, a storage device **506**, a video controller **508**, a system memory **510**, and a display **514**, and a communication device **516** all of which are operably coupled to one another by one or more buses **512**. The storage device **506** could include any type of computer readable medium. The storage device **506** could be a floppy drive, hard drive, CD-ROM, optical drive, or any other form of storage device. In addition, the storage device **506** may be capable of receiving a floppy disk, CD-ROM, DVD-ROM, or any other form of computer-readable medium that may contain computer-executable instructions. Further, the communication device **516** could be a modem, network card, wireless chipset, or any other device to enable the node to communicate with other nodes. It is understood that any node could represent a plurality of interconnected (whether by intranet or Internet) computer systems, including without limitation, personal computers, mainframes, PDAs, and cell phones. In several exemplary embodiments, the node **500** and/or one or more components thereof, including one or more of the microprocessor **502**, the input device **504**, the storage device **506**, the video controller **508**, the system memory **510**, the display **514**, and the communication device **516**, and/or any combination thereof, are distributed throughout the system **100** and/or one or more components thereof, and/or any combination thereof.

In an exemplary embodiment, the visitor's computing device **104**, and each of the servers **108**, **110**, **116**, and **120** is a node **500**.

The system **100** includes at least hardware capable of executing machine readable instructions, as well as the software for executing acts (typically machine-readable instructions) that produce a desired result. In addition, the system **100** may include hybrids of hardware and software, as well as computer sub-systems.

Hardware generally includes at least processor-capable platforms, such as client-machines (also known as personal computers or servers), and hand-held processing devices (such as smart phones, portable computing devices, or personal computing devices (PCDs), for example). Further, hardware may include any physical device that is capable of storing machine-readable instructions, such as memory or other data storage devices. Other forms of hardware include

hardware sub-systems, including transfer devices such as modems, modem cards, ports, and port cards, for example. Software includes any machine code stored in any memory medium, such as RAM or ROM, and machine code stored on other devices (such as floppy disks, flash memory, or a CD ROM, for example). Software may include source or object code, for example. In addition, software encompasses any set of instructions capable of being executed in a client machine or server. Combinations of software and hardware could also be used for providing enhanced functionality and performance for certain embodiments of the present disclosure. One example is to directly manufacture software functions into a silicon chip. Accordingly, it should be understood that combinations of hardware and software are also included within the definition of a computer system and are thus envisioned by the present disclosure as possible equivalent structures and equivalent methods.

Computer-readable mediums include passive data storage, such as a random access memory (RAM) as well as semi-permanent data storage such as a compact disk read only memory (CD-ROM). In addition, an embodiment of the present disclosure may be embodied in the RAM of a computer to transform a standard computer into a new specific computing machine.

Data structures are defined organizations of data that may enable an embodiment of the present disclosure. For example, a data structure may provide an organization of data, or an organization of executable code.

The system **100** may be designed to work on any specific architecture. For example, the system may be executed on a single computer, local area networks. client-server networks, wide area networks, internets, hand-held and other portable and wireless devices and networks.

The visitor information database **106**, and any other database described, may be any standard or proprietary database software, such as Oracle, Microsoft Access, SyBase, or DBase II, for example. The database may have fields. records, data, and other database elements that may be associated through database specific software. Additionally, data may be mapped. Mapping is the process of associating one data entry with another data entry. For example, the data contained in the location of a character file can be mapped to a field in a second table. The physical location of the database is not limiting, and the database may be distributed. For example, the database may exist remotely from the server, and run on a separate platform. Further, the database may be accessible across the Internet. Note that more than one database may be implemented.

A method has been described that includes displaying to a recipient an advertisement associated with a first party that contains an interactive element displayed within the advertisement in a network communication associated with a second party, displaying an interface option within the advertisement as a result of an interaction by the recipient with the interactive element, receiving contact information in the interface option from the recipient, and storing the contact information in a database.

A method has been described that includes displaying a second interface option within the advertisement, wherein the second interface option displays a delivery preference selectable by the recipient, receiving the delivery preference in the second interface option, and storing the delivery preference in a database.

A method has been described that includes displaying, to the recipient, a second advertisement associated with a third party that contains a second interactive element within the second advertisement in a second network communication associated with a fourth party, receiving an input from the recipient in the second interactive element, wherein the recipient remains able to interact with the entire portion of the Web page, querying a cookie or other identifier stored on a computer associated with the recipient, identifying an email address associated with the cookie, and sending advertising information to the email address.

A computer readable medium has been described that includes a plurality of instructions including instructions for displaying to a recipient an advertisement associated with a first party that contains an interactive element displayed within the advertisement in a network communication associated with a second party, instructions for displaying an interface option within the advertisement as a result of an interaction by the recipient with the interactive element, instructions for receiving contact information in the interface option from the recipient, and instructions for storing the contact information in a database.

A system been described that includes a an advertisement associated with a first party on a network communication associated with a second party, an interactive element displayed within the advertisement as a result of an interaction by the recipient with the interactive element, an interface option within the advertisement to receive contact information from the recipient; and a database to store the contact information.

In several exemplary embodiments, the elements and teachings of the various illustrative exemplary embodiments may be combined in whole or in part in some or all of the illustrative exemplary embodiments. In addition, one or more of the elements and teachings of the various illustrative exemplary embodiments may be omitted, at least in part, and/or combined, at least in part, with one or more of the other elements and teachings of the various illustrative embodiments.

In several exemplary embodiments, while different steps, processes, and procedures are described as appearing as distinct acts, one or more of the steps, one or more of the processes, and/or one or more of the procedures may also be performed in different orders, simultaneously and/or sequentially. In several exemplary embodiments, the steps, processes and/or procedures may be merged into one or more steps, processes and/or procedures.

In several exemplary embodiments, one or more of the operational steps in each embodiment may be omitted. Moreover, in some instances, some features of the present disclosure may be employed without a corresponding use of the other features. Moreover, one or more of the above-described embodiments and/or variations may be combined in whole or in part with any one or more of the other above-described embodiments and/or variations.

Although several exemplary embodiments have been described in detail above. the embodiments described are exemplary only and are not limiting, and those skilled in the art will readily appreciate that many other modifications, changes and/or substitutions are possible in the exemplary embodiments without materially departing from the novel teachings and advantages of the present disclosure. Accordingly, all such modifications, changes and/or substitutions are intended to be included within the scope of this disclosure as defined in the following claims. In the claims, means-plus-function clauses are intended to cover the structures described herein as performing the recited function and not only structural equivalents, but also equivalent structures.

What is claimed is:

1. A method of online advertising, comprising:

providing an advertisement associated with a first party for display in a network communication delivered to a computing device of a recipient during a browsing session, wherein the advertisement contains an interactive element displayed within the advertisement, and wherein the network communication is associated with a second party different than the first party;

receiving an indication that the recipient activated the interactive element displayed within the advertisement;

determining, in response to the receiving the indication, whether an identifier containing unique identifying information about the recipient is present on the computing device;

if the identifier containing unique identifying information about the recipient is not present on the computing device:

causing a text field to be displayed in at least a portion of the advertisement;

receiving contact information inputted into the text field by the recipient;

generating a user profile associated with the recipient based on the contact information; and

causing an identifier associated with the user profile to be stored on the computing device of the recipient; and

if the identifier containing unique identifying information about the recipient is present on the computing device:

retrieving a user profile associated with the recipient from a visitor information database using at least a portion of the identifier, wherein the user profile comprises at least delivery method preferences and demographic information;

retrieving additional information associated with the advertisement based on at least a portion of the user profile associated with the recipient;

delivering the additional information to the recipient based on the delivery method preferences, the delivering being performed without interrupting the browsing session of the recipient; and

recording the activation by the recipient of the interactive element as recipient tracking data in an analytics server, the recipient tracking data being associated with the unique identifying information about the recipient.

2. The method of claim 1, further including:

causing an interface option to be displayed in at least a portion of the advertisement, wherein the interface option includes a plurality of delivery methods selectable by the recipient;

receiving an indication of at least one delivery method selected by the recipient; and

updating the delivery method preferences in the user profile of the recipient to reflect the at least one delivery method selected by the recipient.

3. The method of claim 1, further including:

causing a plurality of selectable delivery preference options to be displayed in at least a portion of the advertisement, the plurality of selectable delivery preference options including types of additional information available for delivery to the recipient;

receiving an indication of at least one delivery preference selected by the recipient; and

updating the user profile of the recipient to reflect the at least one delivery preference selected by the recipient.

4. The method of claim 1, further including:

providing a further advertisement associated with a third party for display in a further network communication delivered to the computing device of the recipient, wherein the further advertisement contains a further interactive element displayed within the further advertisement, and wherein the further network communication is associated with a fourth party different than the third party;

receiving an indication that the recipient activated the further interactive element displayed within the further advertisement;

if the identifier containing unique identifying information about the recipient is present on the computing device:

retrieving the user profile associated with the recipient from the visitor information database using at least a portion of the identifier;

retrieving further additional information associated with the further advertisement based on at least a portion of the user profile associated with the recipient;

delivering the further additional information to the recipient based on the delivery method preferences, the delivering being performed without interrupting the browsing session of the recipient; and

recording the activation by the recipient of the further interactive element as recipient tracking data in the analytics server.

* * * * *

FORM 19. Certificate of Compliance with Type-Volume Limitations

Form 19
July 2020

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 24-1551

**Short Case Caption:** Adnexus Incorporated v Meta Platforms Inc.

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

- [x] the filing has been prepared using a proportionally-spaced typeface and includes 7,253 words.
- [ ] the filing has been prepared using a monospaced typeface and includes ______ lines of text.
- [ ] the filing contains ______ pages / ______ words / ______ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. ______).

Date: 06/17/2024

Signature: /s/ Charles S. Cotropia

Name: Charles S. Cotropia

Save for Filing